UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| DARRYL KEITH LOUIS, JR, a/k/a Sadiq,<br><br>Plaintiff,<br><br>-vs-<br><br>JOEL ANDERSON, CHARLES M. WILLIAMS, and LAWSHAWN PEOPLES,<br><br>Defendants. | Civil Action No. 1:25-cv-0294-BHH-TER<br><br>**REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

This action arises out of Plaintiff's incarceration within the South Carolina Department of Corrections. Plaintiff, who is proceeding pro se, argues that Defendants have violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq*. Presently before the Court are Plaintiff's Second Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 140), Plaintiff's Motion for Summary Judgment (ECF No. 172), Defendants' Motion for Summary Judgment and/or Motion to Dismiss (ECF No. 191), Plaintiff's Motion to Compel (ECF No. 199), and Plaintiff's Motion for Sanctions (ECF No. 200). Because Plaintiff his proceeding pro se, he was advised was advised pursuant to *Roseboro v. Garrison*, 528 F.3d 309 (4th Cir. 1975), that a failure to respond to Defendants' motion could result in the motion being granted and his claims being dismissed. Though Plaintiff requested and was granted more than one extension of time to respond to Defendants' motion, the final, extended deadline has passed, and Plaintiff has failed to file a response. All pretrial proceedings in this

case were referred to the undersigned pursuant to the provisions of 28 U.S.C. 636(b)(1)(A) and (B) and Local Rule 73.02 (B)(2)(f), DSC.

**II. RULE 41(B)**

"The Federal Rules of Civil Procedure recognize that courts must have the authority to control litigation before them, and this authority includes the power to order dismissal of an action for failure to comply with court orders. Fed.R.Civ.P. 41(b)." *Ballard v. Carlson*, 882 F.2d 93, 95 (4th Cir. 1989). The Fourth Circuit, in *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978), recognizing that dismissal with prejudice is a harsh sanction which should not be invoked lightly, set forth four considerations in determining whether Rule 41(b) dismissal is appropriate: (1) the degree of personal responsibility on the part of the plaintiff; (2) the amount of prejudice to the defendant caused by the delay; (3) the presence or absence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal. *Id.* at 70.

Subsequently, however, the Fourth Circuit noted that "the four factors ... are not a rigid four-pronged test." *Ballard*, 882 F.2d at 95. "Here, we think the Magistrate's explicit warning that a recommendation of dismissal would result from failure to obey his order is a critical fact that distinguishes this case from those cited by appellant. . . . In view of the warning, the district court had little alternative to dismissal. Any other course would have placed the credibility of the court in doubt and invited abuse." *Id.* at 95 96.

In the present case, the undersigned entered a *Roseboro* Order (ECF No. 37) warning Plaintiff that a failure to respond to Defendants' motion could result in dismissal of his case. Plaintiff has failed to respond to Defendants' motion. It is solely through Plaintiff's neglect, and

not that of an attorney, that Plaintiff has failed to respond to the motion. Defendants cannot come to a resolution of this case if Plaintiff fails to prosecute it. Accordingly, the undersigned concludes that Plaintiff has abandoned his claims in this case. For that reason, dismissal of this action is appropriate under Rule 41(b). In the alternative, the pending motions are discussed below.

## III. DISCUSSION

### A. Procedural History

At the time Plaintiff filed this action, he was incarcerated at the Ridgeland Correctional Institution, and he specifically alleged that "[a]ll claims arose while Plaintiff was housed at Ridgeland Correction Institution (RCI) within the South Carolina Department of Corrections (SCDC). All claims arose between the months of August-December of 2024." Original Complaint p. 11 (ECF No. 1). Therein, Plaintiff alleged that Defendants have violated his "fundamental right to: contact visits; conjugal visits; congregational prayers with his visitors; celebrating the days of Eid with his visitors; celebrating the Eids outside in an open area; wearing hemmed trousers and wearing a thobe or Khamis during worship." *Id.* at p. 7. Since that time, Plaintiff has amended his complaint four times, adding and removing Defendants each time he moved to a different facility within SCDC. *See* First Am. Compl. (ECF No. 47); Second Am. Compl. (ECF No. 84); Third Am. Compl. (ECF No. 102); Fourth Am. Compl. (ECF No. 128).

Prior to moving to amend his complaint the first time, Plaintiff filed his first Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 20). In his Declaration in support thereof, he acknowledged that institutions within the SCDC allow different religious practices and that he was able to engage in practices while incarcerated at other institutions that he was not allowed to participate in at RCI. Pl. Decl. ¶ 32, 37 (ECF No, 20-3).

Ultimately, his first Motion for Temporary Restraining Order and Motion for Preliminary Injunction was denied as moot because Plaintiff sought relief regarding issues that arose at RCI and he was no longer incarcerated there. *See* Report and Recommendation (ECF No. 44); Order (ECF No. 117).

Plaintiff filed his most recent iteration—his Fourth Amended Complaint (ECF No. 128)—after being transferred to the Trenton Correctional Institution (TCI) and added its Warden, Lashawn Peoples, as a defendant.[1] Therein, he continues to allege that he sought religious accommodations between August and December of 2024 to have his uniform pants hemmed, for permission of approved family and friends to participate in the Eids, to wear a thobe or a Khamis during his times of worship and to wear an untucked shirt at all other times, to have "continual, conjugal visits," for approved family and friends to pray in congregation with him during visitation, and for approval to participate in the Eid service outside in an open area within the institution. Fourth Am. Compl. p. 5. He alleges that "all the issues subject of this matter [sic] are ongoing" at TCI. *Id.* p. 7. He seeks a declaratory judgment that Defendants in this action have violated the RLUIPA for denying him the accommodations set forth above. He seeks to enjoin Defendants from preventing him from practicing his sincerely-held beliefs. He further seeks nominal damages against Defendants to discourage them from placing restrictions against him in the future. Fourth Am. Compl. p. 9.

As set forth above, currently-pending before the Court are Plaintiff's second Motion for Temporary Restraining Order and for Preliminary Injunction, Plaintiff's Motion for Summary Judgment, Defendants' Motion for Summary Judgment, Plaintiff's Motion to Compel, and

1The other two Defendants, Joel Anderson and Charles M. Williams, have been Defendants in this case since it was filed.

Plaintiff's Motion for Sanctions.

**B. Motions to Compel and for Sanctions**

Plaintiff seeks to compel Defendant Peeples to fully respond to his discovery requests. Local Civil Rule 37.01(A) requires that "[m]otions to compel discovery must be filed within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed or, where no response has been received, within twenty-one (21) days after the response was due." The responses at issue were served on Plaintiff on February 16, 2026. However, Plaintiff did not file his motion to compel until May 11, 2026. Plaintiff's motion was filed outside the 21 day deadline required by Local Civil Rule 37.01(A). Accordingly, Plaintiff's Motion to Compel is denied as untimely.

Plaintiff also seeks sanctions against Defendant Peeples for failing to provide full responses to his requested discovery. He asks the court to strike his answer. Rule 37(d)(1)(A)(ii) of the Federal Rules for Civil Procedure provides that a court may, on motion, order sanctions if "a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response." Here, Peeples did not fail to serve responses to Plaintiff's discovery. Sanctions are available under Rule 37(d)(1)(A)(ii) only when a party fails altogether to serve discovery responses. Thus, Motion for Sanctions is denied.

**C. Motions for TRO and for Summary Judgment**

Both Plaintiff and Defendants have filed motions for summary judgment. Defendants first argue that summary judgment is appropriate on all Plaintiff's claims other than his challenge regarding the ban on conjugal visits because Plaintiff has failed to exhaust his administrative remedies as to his religious accommodations claims.

The Prison Litigation Reform Act (PLRA) requires that a prisoner exhaust the available administrative remedies before filing a §1983 action concerning conditions of his confinement. 42 U.S.C.1997e(a). In enacting the PLRA, Congress carved out an exception to the general rule that exhaustion of state remedies is not a prerequisite to filing a civil rights suit. The PLRA amended section 1997e so that it now provides, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). Accordingly, before Plaintiff may proceed with his claims in this Court, he must first exhaust his administrative remedies. The PLRA's exhaustion requirement is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The exhaustion requirement applies even if the relief sought in the civil action is not available in the administrative proceedings. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the exhaustion requirement applies whether the action was filed in federal court or was filed in state court and later removed to federal court. *Blakely v. Ozmint*, C/A No. 4:04-cv-22942-MBS, 2006 WL 2850545, at *2 (D.S.C. Sept. 29, 2006). A defendant bears the burden of establishing that a plaintiff failed to exhaust his administrative remedies. *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017).

Exhaustion is defined by each prison's grievance procedure, not the PLRA, and a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). A failure

to exhaust all levels of administrative review is not "proper exhaustion" and will bar actions filed by inmates under any federal law, including § 1983. *Id.* "The Court may take judicial notice of the SCDC grievance process, specifically, SCDC Policy GA–01.12." *Malik v. Ward*, No. 8:08-CV-01886, 2010 WL 936777, at *2 (D.S.C. Mar. 16, 2010). To summarize the process, an inmate must first submit a Request to Staff Member Form (RTSM) or Automated Request to Staff Member ("ARTSM"). SCDC Policy No. GA-O 1.12 at § 13.[2] Thereafter, the inmate must file a Step 1 Grievance Form (10-5), setting forth the issue grieved. *Id.* Inmates may then appeal an SCDC decision as to the Step 1 Grievance by filing a Step 2 Grievance Form (10-5A). *Id.* at § 13.7. SCDC's response to a Step 2 Grievance is considered the final Department decision on an issue. *Id.*

In his Fourth Amended Complaint, when asked if Plaintiff had filed a grievance with respect to the claims raised therein, Plaintiff stated "yes" and refers to documents attached to his Original Complaint. At the time Plaintiff filed his Original Complaint, Plaintiff was housed at RCI, not TCI. The grievances attached to the Original Complaint were all filed while Plaintiff was housed at RCI, and the Court has already ruled that those claims became moot once Plaintiff was transferred out of RCI. *See* Order (ECF No. 117).

In the operative pleading currently before the Court, Plaintiff alleges that Warden Lawshawn Peoples does not allow Muslim inmates to pray in congregation with approved family and friends during visitation, participate on the Eids outsider in an open area within the institution, nor does he allow family or friends to participate in the Eids. There is no evidence in the record that Plaintiff grieved these issues at TCI. While at TCI, Plaintiff has filed grievances regarding the

2 A copy of the SCDC Grievance Policy can be found at https://doc.sc.gov/sites/doc/files/Documents/policy/GA-01-12.pdf.

number of books he is allowed to have, the approved book vendors, the denial of his request for nail clippers, a change in policy regarding wearing a Kufi, and access to non-formulary medicines. *See* TCI Grievances (ECF No. 191-6). The only grievance arguably related to the issues raised in the present case is Plaintiff's grievance regarding wearing a Kufi. However, the record reflects that no Step 2 appeal was submitted on the issue. For these reasons, Plaintiff has failed to exhaust the issues alleged in his Fourth Amended Complaint with respect to the religious accommodations he seeks.[3]

A narrow exception exists to the PLRA's requirement to exhaust administrative remedies which stems from the statutory language itself: an inmate need not pursue administrative remedies if they are not "available." *Ross*, 578 U.S. at 642; *see also Moore*, 517 F.3d at 725 ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."). A grievance process is rendered unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644. Plaintiff did not file a response to Defendants' motion and, thus, has not argued that administrative remedies were not available to him, nor can he, given that he has filed several grievances since he has been at TCI, just not on the issues raised in his Fourth Amended Complaint. Accordingly, summary judgment is appropriate as to Plaintiff's religious accommodations claims.

The only other claim alleged by Plaintiff is his request for conjugal visits. This claim

3 Not only did Plaintiff fail to exhaust his administrative remedies on these issues while at TCI, Warden Peeples avers that Plaintiff never made any requests for any religious accommodations and, thus, the claims are not ripe. *See Louis v. Anderson*, No. 1:25-CV-2958-BHH, 2026 WL 836383, at *3 (D.S.C. Mar. 26, 2026) (finding plaintiff's RLUIPA clam not yet ripe because plaintiff had not complied with SCDC policy with respect to requesting changes to religious practices).

involves a state statute, rather than the application of policies at individual institutions. Therefore, Plaintiff sufficiently exhausted his administrative remedies with respect to this claim with the Step 1 and Step 2 grievances he filed in October of 2024. *See* RCI Grievances (ECF No. 1-1). In his Fourth Amended Complaint, Plaintiff asks the court to issues a mandatory injunction allowing him to have "continual, conjugal visits" with his spouse.

As the Plaintiff acknowledges, South Carolina statutory law prohibits conjugal visits. Section 24-3-81 of the South Carolina Code of Laws provides: "A prisoner who is incarcerated within the state prison system or who is being detained in a local jail, local detention facility, local correctional facility, or local prison camp, whether awaiting a trial or serving a sentence, is not permitted to have conjugal visits." S.C. Code Ann. § 24-3-81. Thus, SCDC is prohibited by state statutory law from allowing conjugal visits. The Plaintiff contends that the state statute substantially burdens his religious exercise in violation of RLUIPA.

Section 3 of RLUIPA protects prisoners' right to exercise their religion. 42 U.S.C. § 2000cc-1(b)(1). To prevail under RLUIPA, a prisoner must first make a prima facie showing that a state substantially burdened his religious exercise. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). "[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id*. at 187 (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div*., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). After a prisoner makes a prima facie showing of a substantial burden, the government's position must survive strict scrutiny. *Id.* at 186. Strict scrutiny requires the state to show that its policy is the "least restrictive means of furthering a compelling governmental interest." *Id*. at 189.

Defendants argue that Plaintiff fails to show that the statute prohibiting conjugal visits places a substantial burden on his religious exercise. A plaintiff's religious exercise is substantially burdened where the government's actions require him to "engage in conduct that seriously violates [his] religious beliefs." *Holt v. Hobbs*, 574 U.S. 352, 361, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015). (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014)). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 (4th Cir. 2023).

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting § 2000cc-3(g)). In other words, "Congress 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Coward v. Robinson*, 276 F. Supp. 3d 544, 566 (E.D. Va. 2017) (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004)). Courts determine whether an individual's beliefs are religious by looking at whether the beliefs are (1) sincerely held and (2) religious in nature. *Moore-King v. Cnty. of Chesterfield*, 708 F.3d 560, 570-71 (4th Cir. 2013), abrogated on other grounds by *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018).

In his Motion for Summary Judgment, Plaintiff argues that S.C. Code Ann. § 24-3-81 places a substantial burden on his intimate associations and familial relations, namely ongoing

sexual relations with his wife. He asserts that his religious practice as a Muslim forbids celibacy and prescribes being affectionate with family, to include "repetitive kissing, hugging, hugging, holding of hands, and touching." Pl. Mot. for Sum. Judg. P. 5 (ECF No. 172). In his Declaration, Plaintiff states that this particular dictate of his religion is part of the Quaran and the Sunnah of the Prophet. Pl. Decl. ¶ 8 (ECF No. 172-1). He asserts that marital intercourse must be accomplished in accordance with religious law and cites to several hadith[4] from "The Hadith Sahih Al-Bukari. *Id.* at ¶ 9. These passages, as cited by Plaintiff, encourage marriage, consummation of marriage, and sexual relations within marriage. Pl. Decl. ¶¶ 10-14. However, nothing cited by Plaintiff indicates that his religion prohibits periods of celibacy. Plaintiff also cites to his marriage contract with his wife, though it makes no mention that sexual relations are required. *See* Marriage Contract (ECF No. 172-3). It states only that "sexual relations will be consensual at all times and will, like all other relations, be based on mutual trust and respect." *Id.* Defendants point to "A Correctional Institution's Guide to Islamic Religious Practices," created by the Council on American-Islamic Relations, which discusses obligatory practices for Muslims but makes no mention of sexual relationships with spouses.

Nevertheless, even if Plaintiff can show that the prohibition of conjugal visits creates a substantial burden to his religious exercise, that prohibition survives strict scrutiny. Strict scrutiny requires the state to show that its policy is the "least restrictive means of furthering a compelling governmental interest." *Lovelace v. Lee*, 472 F.3d at 189. Colie Rushton, the current Director of Security and Emergency Operations for SCDC, avers that there was a period of time in SCDC's history where conjugal visits were permitted for certain qualifying inmates. Rushton Aff. ¶ 3 (ECF

4 Hadith are "sayings, actions, and approvals of the prophet Muhammad." *See* A Correctional Institution's Guide to Islamic Religious Practices (ECF No. 191-4).

No. 191-2). Rushton provides that that the program ended in the mid-1990s "due to security concerns related to contraband smuggling, security risks during the visits, health-related concerns, and the additional staffing that was necessary for the program." Rushton Aff. ¶ 3. He sets forth in specific detail the security risks that existed prior to the ban on conjugal visits:

> While the program was in effect prior to the mid-1990s, I recall that there were instances where contraband, including illicit drugs, were smuggled into corrections facilities through the conjugal visits. The inability to directly supervise the activities between the inmates and their spouses created the opportunities for the contraband to enter the institutions.
>
> Additionally, I recall that there were instances where health issues arose based on the transmission of sexually transmitted diseases (STDs) between the participants in the conjugal visits, both with STDs being introduced into the facilities having been transmitted by the spouse to the inmate as well as STDs being transmitted from the inmate to the spouse. I recall instances where public health officials would initiate investigations to identify the source of STD transmissions, which led to findings that the SCDC conjugal visits as being the source for the transmission. There were also instances where the conjugal visits would lead to marital discord between inmates and their spouses where the spouse would receive an STD and, through the investigations by public health officials, the spouse would learn that the inmate had engaged in homosexual activity within the prison. These circumstances elevated inmate unrest and created security issues.
>
> I am also personally aware of a conjugal visit in the 1980s at Cross Anchor Correctional Institution that facilitated an inmate escape from the facility. I was working at Cross Anchor at the time and was involved in the re-capture of the inmate.

Rushton Aff. ¶¶ 4-6. Rushton also addresses Plaintiff's arguments regarding less restrictive measures that could be taken to address the legitimate, penological concerns with conjugal visits:

> I understand that the Plaintiff has suggested that the health concerns with the transmission of STDs may be addressed by the requirement for medical screening of the Plaintiff and his spouse. That approach, however, is not practical or feasible to address or alleviate the health concerns related to the spread of STDs. The fact that the individuals may take and pass STD tests on a particular date does not mean that they will remain STD-free when the conjugal visit or visits occur.

> Additionally, based on my understanding, there is not a single test for all STDs. Some tests take a few days or even weeks to come back from a laboratory. There is also expense associated with the STD testing making this measure cost-prohibitive in addition to being not feasible.
>
> Requiring the Plaintiff and his spouse to review a PREA seminar and/or be provided condoms will likewise not address the health concerns related to the spread of STDs. Condoms do not prevent the spread or even lower the risk of all STDs. Additionally, there is no guarantee that the participants will use the condoms provided or as directed, and there would be no workable mechanism for ensuring compliance.
>
> The proposal of providing a panic button or walkie-talkie to the spouse will not address the public safety concerns associated with any sexual activity that may not be fully consensual or could result in violence. The inmate could make threats to his spouse to keep the spouse from seeking any assistance or physically prevent the use of the panic button or walkie-talkie.
>
> The Plaintiff also makes the additional suggestion of posting "extra security staff" outside the "designated room," but that is not feasible given the shortages in security staffing that SCDC has had and continues to experience, like all local correctional facilities in South Carolina, despite extensive efforts to recruit and retain security staff. SCDC, as a whole, currently has a vacancy rate of 62.3% of the authorized positions for frontline correctional officers (consisting of cadets through corporals) who supervise inmate visitations. There are 2,267 authorized positions, and currently 855 of those positions are filled. At Trenton Correctional Institution, where the Plaintiff is housed, the vacancy rate of authorized positions for frontline correctional officers is 63.8%. There are 69 authorized positions, and currently 25 of those positions are filled. In effect, conjugal visits would require security manpower that is much more needed in other areas to allow SCDC to keep the inmates and staff safe and the institutions operating properly.
>
> The Plaintiff has also suggested using contract security such as Allied Security employees; however, those persons are not trained and certified correctional officers under state law and cannot have direct interaction with inmates. Thus, the use of contract security to supervise conjugal visits is not lawful, practical, or possible.

Rushton Aff. ¶¶ 15-19.

To satisfy RLUIPA's "least restrictive means" test, a prison must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of

religion by the objecting part[y].” *Holt*, 574 U.S. at 364-65, 135 S.Ct. 853 (quoting *Burwell*, 573 U.S. at 728, 134 S.Ct. 2751). This “standard is exceptionally demanding,” *Burwell*, 573 U.S. at 728, 134 S.Ct. 2751, and requires the government, proactively, to identify and rebut less restrictive policy alternatives, *Ramirez*, 595 U.S. at 432, 142 S.Ct. 1264 (noting that it is the government's obligation to “rebut ... obvious alternatives” and demonstrate that there are no “less restrictive means,” and that to conclude otherwise “gets things backward” (citation omitted)). Defendants have met this burden by identifying possible, less restrictive means and rebutting them.[5]

For these reasons, summary judgment in Defendants’ favor is appropriate as to Plaintiff’s RLUIPA challenge on the ban of conjugal visits. Further, to obtain a TRO or a preliminary injunction, Plaintiff must establish that (1) there is a likelihood of success on the merits; (2) there is a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. See *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure on any one of the *Winter* factors requires denial of the motion for a TRO. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2010). For the same reasons discussed above, Plaintiff fails to show a likelihood of success on the merits. Therefore, Plaintiff’s motion for a TRO or preliminary injunction fails.

5 Furthermore, though few courts that have considered this issue, those that have found that a ban on conjugal visits survives strict scrutiny. *See Robertson v. Kansas*, No. 07-3162-SAC, 2007 WL 4322781 (D. Kan. 2007) (denying plaintiff's claim for conjugal visits under RLUIPA because such visits would burden prison officials and present security risks. *See also, Marsh v. Ganholm*, No. 2:05-cv-134, 2006 WL 2439760 (W.D. Wich. 2006) (granting summary judgment on plaintiff's RLUIPA claim because the denial of conjugal visits was the least restrictive means of furthering the government's interest in institutional safety).

## IV. CONCLUSION

For the reasons discussed above, it is recommended that this case be dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. In the alternative, it is recommended that Plaintiff's Second Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 140) be denied, Plaintiff's Motion for Summary Judgment (ECF No. 172) be denied, Defendants' Motion for Summary Judgment and/or Motion to Dismiss (ECF No. 191) be granted, and this case be dismissed in its entirety. Further, Plaintiff's Motion to Compel (ECF No. 199) and Motion for Sanctions (ECF No. 200) are denied.

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 16, 2026
Columbia, South Carolina

**The parties are directed to the important information on the following page.**