UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| DARRYL KEITH LOUIS, JR, a/k/a Sadiq, Plaintiff, | ) | Civil Action No. 1:25-cv-0294-BHH-TER |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| JOEL ANDERSON, CHARLES M. WILLIAMS, and LAWSHAWN PEOPLES, Defendants. | ) | |

## I. INTRODUCTION

This action arises out of Plaintiff's incarceration within the South Carolina Department of Corrections. Plaintiff, who is proceeding pro se, argues that Defendants have violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq*. Presently before the Court are Plaintiff's Second Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 140), Plaintiff's Motion for Summary Judgment (ECF No. 172), and Defendants' Motion for Summary Judgment and/or Motion to Dismiss (ECF No. 191). Because Plaintiff is proceeding pro se, he was advised pursuant to *Roseboro v. Garrison*, 528 F.3d 309 (4th Cir. 1975), that a failure to respond to Defendants' motion could result in the motion being granted and his claims being dismissed. Plaintiff timely filed a Response (ECF No. 219).[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the

1Though Plaintiff's Response to Defendants' motion and his Reply (ECF No. 221) regarding his own Motion for Summary Judgment were timely submitted after requesting and obtaining an extension of time, due to a clerical error, they were filed in another of his cases. As a result, the undersigned was unaware of these filings when the first

provisions of 28 U.S.C. 636(b)(1)(A) and (B) and Local Rule 73.02 (B)(2)(f), DSC. This Report and Recommendation in entered for review by the District Judge.

## II. PROCEDURAL HISTORY

At the time Plaintiff filed this action, he was incarcerated at the Ridgeland Correctional Institution, and he specifically alleged that "[a]ll claims arose while Plaintiff was housed at Ridgeland Correction Institution (RCI) within the South Carolina Department of Corrections (SCDC). All claims arose between the months of August-December of 2024." Original Complaint p. 11 (ECF No. 1). Therein, Plaintiff alleged that Defendants have violated his "fundamental right to: contact visits; conjugal visits; congregational prayers with his visitors; celebrating the days of Eid with his visitors; celebrating the Eids outside in an open area; wearing hemmed trousers and wearing a thobe or Khamis during worship." *Id.* at p. 7. Since that time, Plaintiff has amended his complaint four times, adding and removing Defendants each time he moved to a different facility within SCDC. *See* First Am. Compl. (ECF No. 47); Second Am. Compl. (ECF No. 84); Third Am. Compl. (ECF No. 102); Fourth Am. Compl. (ECF No. 128).

Prior to moving to amend his complaint the first time, Plaintiff filed his first Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 20). In his Declaration in support thereof, he acknowledged that institutions within the SCDC allow different religious practices and that he was able to engage in practices while incarcerated at other institutions that he was not allowed to participate in at RCI. Pl. Decl. ¶ 32, 37 (ECF No, 20-3). Ultimately, his first Motion for Temporary Restraining Order and Motion for Preliminary Injunction was denied as moot because Plaintiff sought relief regarding issues that arose at RCI

Report and Recommendation was filed. When the error was discovered, the District Judge declined to adopt the first Report and Recommendation and remanded the matter to the undersigned for consideration of those filings.

and he was no longer incarcerated there. *See* Report and Recommendation (ECF No. 44); Order (ECF No. 117).

Plaintiff filed his most recent iteration—his Fourth Amended Complaint (ECF No. 128)—after being transferred to the Trenton Correctional Institution (TCI) and added its Warden, Lashawn Peoples, as a defendant.[2] Therein, he continues to allege that he sought religious accommodations between August and December of 2024 to have his uniform pants hemmed, for permission of approved family and friends to participate in the Eids, to wear a thobe or a Khamis during his times of worship and to wear an untucked shirt at all other times, to have "continual, conjugal visits," for approved family and friends to pray in congregation with him during visitation, and for approval to participate in the Eid service outside in an open area within the institution. Fourth Am. Compl. p. 5. He alleges that "all the issues subject of this matter [sic] are ongoing" at TCI. *Id.* p. 7. He seeks a declaratory judgment that Defendants in this action have violated the RLUIPA for denying him the accommodations set forth above. He seeks to enjoin Defendants from preventing him from practicing his sincerely-held beliefs. He further seeks nominal damages against Defendants to discourage them from placing restrictions against him in the future. Fourth Am. Compl. p. 9.

As set forth above, currently-pending before the Court are Plaintiff's second Motion for Temporary Restraining Order and for Preliminary Injunction, Plaintiff's Motion for Summary Judgment, Defendants' Motion for Summary Judgment, Plaintiff's Motion to Compel, and Plaintiff's Motion for Sanctions.

---

2The other two Defendants, Joel Anderson and Charles M. Williams, have been Defendants in this case since it was filed.

## III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.*, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. *See Celotex*, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc*., 33 F.3d 390 (4th Cir. 1994); *Orsi v. Kickwood*, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV. DISCUSSION

Both Plaintiff and Defendants have filed motions for summary judgment. Defendants first argue that summary judgment is appropriate on all Plaintiff's claims other than his challenge regarding the ban on conjugal visits because Plaintiff has failed to exhaust his administrative remedies as to his religious accommodations claims.

The Prison Litigation Reform Act (PLRA) requires that a prisoner exhaust the available administrative remedies before filing a §1983 action concerning conditions of his confinement. 42 U.S.C.1997e(a). In enacting the PLRA, Congress carved out an exception to the general rule that exhaustion of state remedies is not a prerequisite to filing a civil rights suit. The PLRA amended section 1997e so that it now provides, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). Accordingly, before Plaintiff may proceed with his claims in this Court, he must first exhaust his administrative remedies. The PLRA's exhaustion requirement is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The exhaustion requirement applies even if the relief sought in

the civil action is not available in the administrative proceedings. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the exhaustion requirement applies whether the action was filed in federal court or was filed in state court and later removed to federal court. *Blakely v. Ozmint*, C/A No. 4:04-cv-22942-MBS, 2006 WL 2850545, at *2 (D.S.C. Sept. 29, 2006). A defendant bears the burden of establishing that a plaintiff failed to exhaust his administrative remedies. *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017).

Exhaustion is defined by each prison's grievance procedure, not the PLRA, and a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). A failure to exhaust all levels of administrative review is not "proper exhaustion" and will bar actions filed by inmates under any federal law, including § 1983. *Id.* "The Court may take judicial notice of the SCDC grievance process, specifically, SCDC Policy GA–01.12." *Malik v. Ward*, No. 8:08-CV-01886, 2010 WL 936777, at *2 (D.S.C. Mar. 16, 2010). To summarize the process, an inmate must first submit a Request to Staff Member Form (RTSM) or Automated Request to Staff Member ("ARTSM"). SCDC Policy No. GA-O 1.12 at § 13.[3] Thereafter, the inmate must file a Step 1 Grievance Form (10-5), setting forth the issue grieved. *Id.* Inmates may then appeal an SCDC decision as to the Step 1 Grievance by filing a Step 2 Grievance Form (10-5A). *Id.* at § 13.7. SCDC's response to a Step 2 Grievance is considered the final Department decision on an issue. *Id.*

In his Fourth Amended Complaint, when asked if Plaintiff had filed a grievance with

3 A copy of the SCDC Grievance Policy can be found at https://doc.sc.gov/sites/doc/files/Documents/policy/GA-01-12.pdf.

respect to the claims raised therein, Plaintiff stated "yes" and refers to documents attached to his Original Complaint. At the time Plaintiff filed his Original Complaint, Plaintiff was housed at RCI, not TCI. The grievances attached to the Original Complaint were all filed while Plaintiff was housed at RCI, and the Court has already ruled that those claims became moot once Plaintiff was transferred out of RCI. *See* Order (ECF No. 117).

In the operative pleading currently before the Court, Plaintiff alleges that Warden Lawshawn Peoples does not allow Muslim inmates to pray in congregation with approved family and friends during visitation, participate in the Eids outside in an open area within the institution, nor does he allow family or friends to participate in the Eids. In response to Defendants' motion, Plaintiff attaches two Step 1 grievances that he filed after Defendants filed their motion for summary judgment. *See* June 2026 Grievances (ECF No. 219-1). In those grievances, he asks that Eid al-Fitr and Eid al-Adah be recognized as special holiday visiting days, that visitors be allowed to participate in the celebration of the two holidays, and that the celebrations be conducted in an outside, open area within the institution. *Id.* Plaintiff received responses to those grievances on June 1 and June 6, but there is no evidence in the record that Plaintiff timely filed Step 2 appeals on these issues. Plaintiff has filed other grievances at TCI regarding the number of books he is allowed to have, the approved book vendors, the denial of his request for nail clippers, a change in policy regarding wearing a Kufi, and access to non-formulary medicines. *See* TCI Grievances (ECF No. 191-6). Of these, the only grievance arguably related to the issues raised in the present case is Plaintiff's grievance regarding wearing a Kufi. However, the record reflects that no Step 2 appeal was submitted on the issue. Plaintiff does not dispute that he has not filed Step 2 appeals at TCI. Rather, he argues that administrative remedies are unavailable.

A narrow exception exists to the PLRA's requirement to exhaust administrative remedies which stems from the statutory language itself: an inmate need not pursue administrative remedies if they are not "available." *Ross*, 578 U.S. at 642; *see also Moore*, 517 F.3d at 725 ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.") A grievance process is rendered unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644. Plaintiff appears to argue that the grievance process at TCI was unavailable because he could not attach documents to the grievances and because he was not allowed to meet with the chaplin, which he argues is required before filing a grievance. However, nothing in the grievance policy requires documents to be submitted or a face-to-face meeting with a staff member prior to filing a grievance. He also gives examples of numerous grievances he and other inmates have filed on other issues that have been unsuccessful. *See* Pl. Resp. (ECF No. 219) pp. 9-13. However, exhaustion of administrative remedies is mandatory even where the inmate claims that exhaustion would be futile. *Booth*, 532 U.S. at 741 n.6; *see also Vaughn v. S.C. Dep't of Corr.*, C/A No. 1:17-cv-3449-TMC-SVH, 2018 WL 2325694, at *2 (D.S.C. Apr. 30, 2018) ("Exhaustion of administrative remedies is not rendered futile just because a prisoner anticipates he will be unsuccessful in his administrative appeals."), R&R adopted by 2018 WL 2323093 (D.S.C. May 21, 2018); *Williams v. Stirling*, C/A No. 2:18-cv-1690-CMC-MGB, 2019 WL 6094512, at *6 (D.S.C. May 21, 2019) ("Plaintiff's assertions that 'a grievance would be futile' are unavailing to establish that he exhausted his administrative remedies or that the administrative remedies should otherwise be considered unavailable."), R&R adopted by 2019 WL 3729396 (D.S.C. Aug. 8, 2019), aff'd, 806 F. App'x 248 (4th Cir. 2020);

*English v. Andrews*, C/A No. 1:13-cv-2793-RBH, 2014 WL 6969629, at *4 (D.S.C. Dec. 9, 2014) ("Because Plaintiff has not refuted Defendants' evidence that he failed to exhaust his administrative remedies [by filing a Step 2 grievance], Defendants are entitled to summary judgment."). These arguments fail. For these reasons, Plaintiff has failed to exhaust the issues alleged in his Fourth Amended Complaint with respect to the religious accommodations he seeks. Accordingly, summary judgment is appropriate as to Plaintiff's religious accommodations claims.

The only other claim alleged by Plaintiff is his request for conjugal visits. This claim involves a state statute, rather than the application of policies at individual institutions. Therefore, Plaintiff sufficiently exhausted his administrative remedies with respect to this claim with the Step 1 and Step 2 grievances he filed in October of 2024. *See* RCI Grievances (ECF No. 1-1). In his Fourth Amended Complaint, Plaintiff asks the court to issues a mandatory injunction allowing him to have "continual, conjugal visits" with his spouse.

As the Plaintiff acknowledges, South Carolina statutory law prohibits conjugal visits. Section 24-3-81 of the South Carolina Code of Laws provides: "A prisoner who is incarcerated within the state prison system or who is being detained in a local jail, local detention facility, local correctional facility, or local prison camp, whether awaiting a trial or serving a sentence, is not permitted to have conjugal visits." S.C. Code Ann. § 24-3-81. Thus, SCDC is prohibited by state statutory law from allowing conjugal visits. The Plaintiff contends that the state statute substantially burdens his religious exercise in violation of RLUIPA.

Section 3 of RLUIPA protects prisoners' right to exercise their religion. 42 U.S.C. § 2000cc-1(b)(1). To prevail under RLUIPA, a prisoner must first make a prima facie showing that a state substantially burdened his religious exercise. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th

Cir. 2006). "[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id*. at 187 (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div*., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). After a prisoner makes a prima facie showing of a substantial burden, the government's position must survive strict scrutiny. *Id.* at 186. Strict scrutiny requires the state to show that its policy is the "least restrictive means of furthering a compelling governmental interest." *Id*. at 189.

Defendants argue that Plaintiff fails to show that the statute prohibiting conjugal visits places a substantial burden on his religious exercise. A plaintiff's religious exercise is substantially burdened where the government's actions require him to "engage in conduct that seriously violates [his] religious beliefs." *Holt v. Hobbs*, 574 U.S. 352, 361, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015). (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014)). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 (4th Cir. 2023).

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting § 2000cc-3(g)). In other words, "Congress 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Coward v. Robinson*, 276 F. Supp. 3d 544, 566 (E.D. Va. 2017)

(quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004)). Courts determine whether an individual's beliefs are religious by looking at whether the beliefs are (1) sincerely held and (2) religious in nature. *Moore-King v. Cnty. of Chesterfield*, 708 F.3d 560, 570-71 (4th Cir. 2013), abrogated on other grounds by *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018).

In his Motion for Summary Judgment, Plaintiff argues that S.C. Code Ann. § 24-3-81 places a substantial burden on his intimate associations and familial relations, namely ongoing sexual relations with his wife. He asserts that his religious practice as a Muslim forbids celibacy and prescribes being affectionate with family, to include "repetitive kissing, hugging, hugging, holding of hands, and touching." Pl. Mot. for Sum. Judg. P. 5 (ECF No. 172). In his Declaration, Plaintiff states that this particular dictate of his religion is part of the Quaran and the Sunnah of the Prophet. Pl. Decl. ¶ 8 (ECF No. 172-1). He asserts that marital intercourse must be accomplished in accordance with religious law and cites to several hadith[4] from "The Hadith Sahih Al-Bukari. *Id.* at ¶ 9. These passages, as cited by Plaintiff, encourage marriage, consummation of marriage, and sexual relations within marriage. Pl. Decl. ¶¶ 10-14. However, nothing cited by Plaintiff indicates that his religion prohibits periods of celibacy. Plaintiff also cites to his marriage contract with his wife, though it makes no mention that sexual relations are required. *See* Marriage Contract (ECF No. 172-3). It states only that "sexual relations will be consensual at all times and will, like all other relations, be based on mutual trust and respect." *Id.* Defendants point to "A Correctional Institution's Guide to Islamic Religious Practices," created by the Council on American-Islamic

4 Hadith are "sayings, actions, and approvals of the prophet Muhammad." *See* A Correctional Institution's Guide to Islamic Religious Practices (ECF No. 191-4).

Relations, which discusses obligatory practices for Muslims but makes no mention of sexual relationships with spouses.

Nevertheless, even if Plaintiff can show that the prohibition of conjugal visits creates a substantial burden to his religious exercise, that prohibition survives strict scrutiny. Strict scrutiny requires the state to show that its policy is the "least restrictive means of furthering a compelling governmental interest." *Lovelace v. Lee*, 472 F.3d at 189. Colie Rushton, the current Director of Security and Emergency Operations for SCDC, avers that there was a period of time in SCDC's history where conjugal visits were permitted for certain qualifying inmates. Rushton Aff. ¶ 3 (ECF No. 191-2).[5] Rushton provides that that the program ended in the mid-1990s "due to security concerns related to contraband smuggling, security risks during the visits, health-related concerns, and the additional staffing that was necessary for the program." Rushton Aff. ¶ 3. He sets forth in specific detail the security risks that existed prior to the ban on conjugal visits:

> While the program was in effect prior to the mid-1990s, I recall that there were instances where contraband, including illicit drugs, were smuggled into corrections facilities through the conjugal visits. The inability to directly supervise the activities between the inmates and their spouses created the opportunities for the contraband to enter the institutions.
>
> Additionally, I recall that there were instances where health issues arose based on the transmission of sexually transmitted diseases (STDs) between the participants

5 Plaintiff argues that the court should not consider Rushton's affidavit because, although Defendants identified Rushton as a potential witness, they did not include his affidavit in response to his discovery request for "all documents, photographs, and any other written or recorded information related to Plaintiff's First Set of Interrogatories to the defendant." Pl. Resp. pp. 29-30. However, a witness affidavit prepared pursuant to Rule 56 in support of or in opposition to a motion for summary judgment is not required to be produced during discovery. Federal Rule of Civil Procedure 34 requires only that a party produce documents that are in existence at the time of the discovery requests, and a party is not required to create a document to respond to a request for production. *See, e.g., Connelly v. Volkswagen Grp. of Am., Inc.* No. 1:19cv1487, 2023 WL 7285234, at *4 (E.D. Va. Nov. 3, 2023). Rushton's affidavit is dated April 10, 2026, and was filed along with Defendants' Motion for Summary Judgment that same day. Thus, the affidavit did not exist at the time Defendants responded to Plaintiff's discovery requests in February of 2026, and Defendants provided Plaintiff with a copy of the affidavit as soon as it was created. Plaintiff also argues that Rushton's affidavit is hearsay because he has not been able to "cross examinate" him. However, as stated above, Defendants named Rushton as a Defendant, and there is no evidence in the record that Plaintiff sought to and was denied the opportunity to depose him.

> in the conjugal visits, both with STDs being introduced into the facilities having been transmitted by the spouse to the inmate as well as STDs being transmitted from the inmate to the spouse. I recall instances where public health officials would initiate investigations to identify the source of STD transmissions, which led to findings that the SCDC conjugal visits as being the source for the transmission. There were also instances where the conjugal visits would lead to marital discord between inmates and their spouses where the spouse would receive an STD and, through the investigations by public health officials, the spouse would learn that the inmate had engaged in homosexual activity within the prison. These circumstances elevated inmate unrest and created security issues.
>
> I am also personally aware of a conjugal visit in the 1980s at Cross Anchor Correctional Institution that facilitated an inmate escape from the facility. I was working at Cross Anchor at the time and was involved in the re-capture of the inmate.

Rushton Aff. ¶¶ 4-6. Rushton also addresses Plaintiff's arguments regarding less restrictive measures that could be taken to address the legitimate, penological concerns with conjugal visits:

> I understand that the Plaintiff has suggested that the health concerns with the transmission of STDs may be addressed by the requirement for medical screening of the Plaintiff and his spouse. That approach, however, is not practical or feasible to address or alleviate the health concerns related to the spread of STDs. The fact that the individuals may take and pass STD tests on a particular date does not mean that they will remain STD-free when the conjugal visit or visits occur.
>
> Additionally, based on my understanding, there is not a single test for all STDs. Some tests take a few days or even weeks to come back from a laboratory. There is also expense associated with the STD testing making this measure cost-prohibitive in addition to being not feasible.
>
> Requiring the Plaintiff and his spouse to review a PREA seminar and/or be provided condoms will likewise not address the health concerns related to the spread of STDs. Condoms do not prevent the spread or even lower the risk of all STDs. Additionally, there is no guarantee that the participants will use the condoms provided or as directed, and there would be no workable mechanism for ensuring compliance.
>
> The proposal of providing a panic button or walkie-talkie to the spouse will not address the public safety concerns associated with any sexual activity that may not be fully consensual or could result in violence. The inmate could make threats to his spouse to keep the spouse from seeking any assistance or physically prevent the use of the panic button or walkie-talkie.

> The Plaintiff also makes the additional suggestion of posting “extra security staff” outside the “designated room,” but that is not feasible given the shortages in security staffing that SCDC has had and continues to experience, like all local correctional facilities in South Carolina, despite extensive efforts to recruit and retain security staff. SCDC, as a whole, currently has a vacancy rate of 62.3% of the authorized positions for frontline correctional officers (consisting of cadets through corporals) who supervise inmate visitations. There are 2,267 authorized positions, and currently 855 of those positions are filled. At Trenton Correctional Institution, where the Plaintiff is housed, the vacancy rate of authorized positions for frontline correctional officers is 63.8%. There are 69 authorized positions, and currently 25 of those positions are filled. In effect, conjugal visits would require security manpower that is much more needed in other areas to allow SCDC to keep the inmates and staff safe and the institutions operating properly.
>
> The Plaintiff has also suggested using contract security such as Allied Security employees; however, those persons are not trained and certified correctional officers under state law and cannot have direct interaction with inmates. Thus, the use of contract security to supervise conjugal visits is not lawful, practical, or possible.

Rushton Aff. ¶¶ 15-19.

To satisfy RLUIPA's “least restrictive means” test, a prison must “sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].” *Holt*, 574 U.S. at 364-65, 135 S.Ct. 853 (quoting *Burwell*, 573 U.S. at 728, 134 S.Ct. 2751). This “standard is exceptionally demanding,” *Burwell*, 573 U.S. at 728, 134 S.Ct. 2751, and requires the government, proactively, to identify and rebut less restrictive policy alternatives, *Ramirez*, 595 U.S. at 432, 142 S.Ct. 1264 (noting that it is the government's obligation to “rebut ... obvious alternatives” and demonstrate that there are no “less restrictive means,” and that to conclude otherwise “gets things backward” (citation omitted)). Defendants have met this burden by identifying possible, less restrictive means and rebutting them.[6]

---

6 Furthermore, though few courts that have considered this issue, those that have found that a ban on conjugal visits survives strict scrutiny. *See Robertson v. Kansas*, No. 07-3162-SAC, 2007 WL 4322781 (D. Kan. 2007) (denying plaintiff's claim for conjugal visits under RLUIPA because such visits would burden prison officials and present

For these reasons, summary judgment in Defendants' favor is appropriate as to Plaintiff's RLUIPA challenge on the ban of conjugal visits. Further, to obtain a TRO or a preliminary injunction, Plaintiff must establish that (1) there is a likelihood of success on the merits; (2) there is a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. See *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure on any one of the *Winter* factors requires denial of the motion for a TRO. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2010). For the same reasons discussed above, Plaintiff fails to show a likelihood of success on the merits. Therefore, Plaintiff's motion for a TRO or preliminary injunction fails.

## IV. CONCLUSION

For the reasons discussed above it is recommended that Plaintiff's Second Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 140) be denied, Plaintiff's Motion for Summary Judgment (ECF No. 172) be denied, Defendants' Motion for Summary Judgment and/or Motion to Dismiss (ECF No. 191) be granted, and this case be dismissed in its entirety.[7]

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 30, 2026
Columbia, South Carolina

**The parties are directed to the important information on the following page.**

---

security risks. *See also, Marsh v. Ganholm*, No. 2:05-cv-134, 2006 WL 2439760 (W.D. Wich. 2006) (granting summary judgment on plaintiff's RLUIPA claim because the denial of conjugal visits was the least restrictive means of furthering the government's interest in institutional safety).

7 If the District Judge accepts this recommendation, all other pending motions will be moot.